FRANK T. SHULL AND ANN R. SHULL, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 63655. Filed June 30, 1958.

*Earl W. Shinn, Esq.*, and *Laird W. Shull, Esq.*, for the petitioners.
*James A. Scott, Esq.*, for the respondent.

MULRONEY, *Judge:* The respondent determined deficiencies in the income tax of petitioners as follows:

| Year | Deficiency |
|------|-----------|
| 1952 | $85,521.50 |
| 1953 | 24,696.42 |

Certain concessions have been made by both parties and the only question remaining for decision here is whether petitioners made valid irrevocable elections to liquidate the Shull Electric Products Corporation under the provisions of section 112 (b) (7) of the Internal Revenue Code of 1939.

### FINDINGS OF FACT.

Petitioners, Frank T. Shull, hereinafter sometimes referred to as Shull, and Ann R. Shull, are husband and wife who reside in Arlington, Virginia, and they filed their Federal income tax returns for the taxable years 1952 and 1953 with the district director of internal revenue at Richmond, Virginia.

The Shull Electric Products Corporation, hereinafter sometimes referred to as the Company, was a Virginia corporation engaged in the manufacture of electric power control equipment. This corporation was the successor in a tax-free reorganization in 1947 of a South Dakota corporation known as the Shull Company. At the time of the organization of the Shull Electric Products Corporation in 1947 the predecessor, the Shull Company, according to its records, had outstanding capital stock of $23,900 and accumulated earnings of $49,037.38. The stock in the successor corporation in the amount of $67,700 was issued to petitioners in exchange for the stock of the predecessor, resulting in a capitalization of the surplus to the extent of $43,800.

During the taxable year 1952, Frank T. Shull was the owner of 67,400 shares and Ann R. Shull was the owner of 300 shares of the capital stock of the Shull Electric Products Corporation; the aggregate cost basis of said stock being $38,400. The principal asset of said Company consisted of land and building at 1260 Jefferson Davis Highway. As of April 1, 1952, the earned surplus of the Shull Electric Products Corporation was $133,996.25, of which amount $43,800 consisted of earned surplus which was capitalized at the time of the formation of the Shull Electric Products Corporation in 1947 and the balance consisted of the earned surplus (as adjusted) according to the books of the corporation.

Petitioners, as the sole stockholders of the Shull Electric Products Corporation, each filed Treasury Department Forms 964 which were received by respondent on April 29, 1952. In these filed forms the two stockholders stated that on March 31, 1952, the Shull Electric Products Corporation had adopted a plan of complete liquidation providing for a distribution in complete cancellation or redemption of all of its stock, and for the transfer of all its property under the liquidation entirely within the month of April 1952 and that they elected to have the gain recognized and taxed in accordance with section 112 (b) (7).[1] Also on April 29, 1952, petitioners Frank T. Shull and Ann R. Shull, as president and treasurer of the Shull Electric Products Corporation, filed on behalf of said corporation Treasury Department Form 966. This is a return of information form required under section 148 (d) and it is designed to give certain information relative to dissolution of a corporation. The pertinent material here is that the form stated that the date of the adoption of the plan of liquidation was March 31, 1952. The form directs that there be attached thereto "a duly certified copy of the resolution or plan." As officers of the Shull Electric Products Corporation, petitioners attached to said Form 966, the following:

MINUTES OF SPECIAL MEETING OF THE STOCKHOLDERS OF SHULL ELECTRIC PRODUCTS CORPORATION MARCH 31, 1952 3 P. M.

The meeting was called to order by the president who stated that it had been called by him for the purpose of securing final action of the stockholders on the liquidation and dissolution of the corporation. He presented the Waiver of Notice of the meeting and asked that the stockholders sign the Waiver of Notice and that such signed waiver be made part of the minutes of the meeting.

There was a roll call of the stockholders and it was found that Frank T. Shull was present representing 67,400 shares and that Ann R. Shull was present representing 300 shares being 67,700 shares of the stock of the corporation, all of the outstanding stock being represented.

The president then reported:

1—That he had consulted the accountant and the lawyer for the corporation and after a full investigation of Internal Revenue Code provisions and requirements of the State of Virginia under the laws of which state the corporation had been chartered it had been decided to liquidate the corporation under Internal Revenue Code Section 112 (b) (7) and to dissolve the corporation under Virginia Laws.

2—That he had requested the attorney to file the necessary papers to dissolve the corporation and the accountant to prepare for filing with the Internal Revenue Service the required notice of the intent of the corporation to liquidate under Internal Revenue Code Section 112 (b) (7) and the election of the stockholders.

3—That it had been determined to point to conclusion of these transactions as of March 31, 1952 and accordingly all legal documents, all accounting statements and Internal Revenue Code reports were ordered to be completed

---

[1] All section references are to the Internal Revenue Code of 1939, as amended, unless otherwise noted.

by that date or as soon thereafter as possible so that business of the corporation would then terminate.

4—That the pertinent and controlling requirements of Internal Revenue Code Section 112 (b) (7) were "under a plan of complete liquidation providing for a distribution in complete cancellation or redemption of all its stock and for the transfer of all its property under the liquidation entirely within one month" and that it had been decided that such could be accomplished within the month of April 1952. He further stated that if the stockholders approved the plan as detailed all Certificates of Stock representing 67,700 shares must be submitted to the corporation for cancellation.

5—That the lawyer had received Certificate of Dissolution of Corporation dated March 27, 1952; the accountant had prepared for submission Internal Revenue Service Form 966 for the corporation and Form 964 for each of the stockholders (Frank T. Shull for 67,400 shares—Ann R. Shull for 300 shares) ; that the lawyer had prepared deed to transfer real estate from the corporation to the stockholders in the ratio of stock owned and that all personal property of the corporation would be transferred to such stockholders, subject to liabilities, in the same ratio.

The above recited details were discussed and thereupon the president requested that the stockholders be polled to vote yes or no for the liquidation proposal and he announced that he, as the principal stockholder, would vote his stock in favor of carrying out the above detailed plan and thereupon voted 67,400 shares "yes" in favor of the plan as proposed and Ann R. Shull thereupon voted 300 shares "yes" in favor of the plan as proposed thus all 67,700 shares of the stock outstanding of the Shull Electric Products Corporation voted in favor of the liquidation and dissolution of the corporation as proposed.

The president thereupon delivered to the secretary of the corporation certificates representing the 67,400 shares of common stock which he owned and Ann R. Shull thereupon delivered to the secretary of the corporation the certificate representing 300 shares of common stock which she owned and there was thus in the possession of the officers of the corporation certificates representing the 67,700 shares of common stock in the corporation authorized and outstanding as of the records on this date, March 31, 1952.

The stockholders then instructed the secretary to mark such certificates "cancelled" and to file such cancelled certificates in the stock book of the corporation against respective stub record thereof.

The president thereupon announced that after all of these transactions had been completed he would call another meeting of the stockholders to make the announcement of the fact that all of the matters necessary and incident to the liquidation of the corporation under Section 112 (b) (7) had been completed.

There being no further business to come before the meeting upon motion made, seconded and carried it was adjourned.

/s/ Vivia S. Farlin,
Secretary

Approved:
/s/ F. T. Shull
FRANK T. SHULL    67,400 shares
/s/ Ann R. Shull
ANN R. SHULL        300 shares

During the month of April 1952, the assets of the Shull Electric Products Corporation were distributed to the stockholders, the petitioners herein. The operating assets, such as inventory, accounts receivable, and equipment were entered upon the books of a newly

organized partnership known as the Shull Electric Products and the real estate was transferred by deed to the petitioners in the month of April 1952. In their 1952 income tax return petitioners did not report any income from the liquidation of the Shull Electric Products Corporation.

In 1955 petitioners' returns for the taxable years 1952 and 1953 were audited by respondent's agent and the agent told petitioners that deficiencies would be asserted against them for each of said years, mostly because of the gain realized by petitioners because of the liquidation under section 112 (b) (7). Thereafter, on August 10, 1955, petitioners filed with respondent a "NOTICE OF REVOCATION OF ELECTION UNDER SECTION 112 (b) (7)." In this notice of revocation signed and filed by both petitioners, it was stated that the petitioners had been advised by their accountant that upon liquidation of the corporation under section 112 (b) (7) they would pay a capital gains tax on the accumulated earnings of the corporation and it was never explained to them that in signing Forms 966 the result would be that the corporation's earnings would be taxed to the shareholders as a dividend. The instrument went on to state that petitioners did not know that the $43,800, the earned surplus of the Shull Company, would be added to the earned surplus of the Shull Electric Products Corporation as shown by the books of that company. The instrument concludes with the following sentence: "You are hereby notified, therefore, of the revocation of our so-called election under Section 112 (b) (7) on the grounds of mistake as to the rights of the taxpayers under the tax laws, and on the grounds of material mistake of fact as to the amount of the earned surplus which would be taxed on liquidation of the corporation."

On May 10, 1956, respondent issued its statutory notice of deficiency, one of the adjustments being the gain realized from the liquidation under section 112 (b) (7), the notice stating, in part, as follows:

(a) It is held that the elections made by you in 1952 for recognition of gain under Section 112 (b) (7) of the Internal Revenue Code (1939) in respect to the complete liquidation of The Shull Electric Products Corporation were valid and final; and that you realized therefrom a taxable gain in the amount of $133,996.25.

OPINION.

Section 112 (b) (7), as amended,[2] provides for an election as to the recognition of gain in certain corporate liquidations. In general, this

---

[2] SEC. 112. RECOGNITION OF GAIN OR LOSS.

(b) EXCHANGES SOLELY IN KIND.—

*   *   *   *   *   *   *

(7) ELECTION AS TO RECOGNITION OF GAIN IN CERTAIN CORPORATE LIQUIDATIONS.—

(A) General Rule.—In the case of property distributed in complete liquidation of a domestic corporation, if—

*   *   *   *   *   *   *

(ii) the distribution is in complete cancellation or redemption of all the stock,

section, the pertinent portions of which we have set forth in the footnote, contains special provisions in the case of liquidations occurring in one calendar month.

Section 113 (a) (18) provides:

(18) PROPERTY RECEIVED IN CERTAIN CORPORATE LIQUIDATIONS.—If the property was acquired by a shareholder in the liquidation of a corporation in cancellation or redemption of stock with respect to which gain was realized, but with respect to which, as the result of an election made by him under paragraph (7) of section 112 (b) * * * of the Revenue Act of 1938, 52 Stat. 487, the extent to which gain was recognized was determined under such paragraph, then the basis shall be the same as the basis of such stock cancelled or redeemed in the liquidation, decreased in the amount of any money received by him, and increased in the amount of gain recognized to him.

The general effect of all of the above statutes, as here applicable, is to postpone the tax upon any gain resulting from a 112 (b) (7) liquidation to the extent of corporate assets received by the stockholders which were not represented by accumulated earnings and profits, but the statute (section 112 (b) (7) (E) (i)) is specific that "[t]here shall be recognized, and taxed as a dividend, so much of the gain as is not in excess of" the electing shareholder's "ratable share of the earnings and profits of the corporation accumulated after February 28, 1913."

These statutes are only applicable when the shareholder files a written election "in such manner as to be not in contravention of regulations prescribed by the Commissioner" and the filing of the written election "must be within thirty days after the adoption of the plan of liquidation." Sec. 112 (b) (7) (D).

Petitioners filed the necessary elections for a 112 (b) (7) liquidation of the Company to be accomplished in the month of April 1952. Thereafter on August 10, 1955, they attempted to revoke their elections which, if granted, would render their gains received in the liquidation

and the transfer of all the property under the liquidation occurs within some one calendar month in 1951, 1952, or 1953—

then in the case of each qualified electing shareholder (as defined in subparagraph (C) gain upon the shares owned by him at the time of the adoption of the plan of liquidation shall be recognized only to the extent provided in subparagraphs (E) and (F).

 \*    \*    \*    \*    \*    \*    \*

(D) Making and Filing of Elections.—The written elections referred to in subparagraph (C) must be made and filed in such manner as to be not in contravention of regulations prescribed by the Commissioner with the approval of the Secretary. The filing must be within thirty days after the adoption of the plan of liquidation, and may be by the liquidating corporation or by the shareholder.

(E) Noncorporate Shareholders.—In the case of a qualified electing shareholder other than a corporation—

(i) There shall be recognized, and taxed as a dividend, so much of the gain as is not in excess of his ratable share of the earnings and profits of the corporation accumulated after February 28, 1913, such earnings and profits to be determined as of the close of the month in which the transfer in liquidation occurred under subparagraph (A) (ii), but without diminution by reason of distributions made during such month; but by including in the computation thereof all amounts accrued up to the date on which the transfer of all the property under the liquidation is completed; and

taxable at capital gains rates under section 115 (c). Petitioners argue their elections were invalid and, if not invalid, then in any event they should be allowed to revoke them.

Petitioners' first argument here is that their elections were not timely filed. They rely upon evidence designed to show that they actually made their decision to liquidate under the provisions of section 112 (b) (7) and adopted a plan to that effect in January 1952.

Frank T. Shull testified that he first considered liquidating the Company for reasons of his health in 1951. There was introduced the minutes of the annual meeting of the stockhholders of the Company held January 2, 1952, showing that Shull spoke on the advisability of liquidating. Shull testified that he then talked with his accountant, who is a certified public accountant with 45 years' experience in tax matters and enrolled to practice before the Tax Court. He said the accountant suggested liquidating the Company under section 112 (b) (7) and assured him that any gain realized therefrom would be taxable at capital gain rate and payment of the tax would be deferred until the building, the principal asset of the Company, would be sold by the stockholders. Shull testified that thereafter a special meeting of the stockholders was held on January 30, 1952, at 3 p. m. The minutes of this meeting were introduced. They show that Shull proposed dissolving the Company and liquidating it under section 112 (b) (7) and a resolution was adopted proposing that a plan for such a liquidation be submitted at a special meeting of the stockholders for consideration and vote upon the said plan. The next special meeting, according to petitioners' evidence, was held at 4 o'clock on the same day and the minutes of this meeting were introduced. They show the favorable vote of 100 per cent of the stockholders on the following resolution:

RESOLVED that the stockholders approve the proposal of the president as set forth in the Minutes of the Board of Directors of this corporation and that the president be authorized to proceed to have such legal and accounting matters completed as would result in the final liquidation of the corporation under Internal Revenue Code Section 112 (b) (7) of the Federal law and the dissolution under state law.

Petitioners argue the foregoing establishes that the adoption of the plan was on January 30, 1952, which means their elections, which were filed April 29, 1952, were filed more than 30 days after the adoption of the plan, in contravention of section 112 (b) (7) (D), and therefore invalid. They explain away the minutes of the special meeting of the stockholders of March 31, 1952, set forth in our findings of fact, and also showing the adoption of the plan on that date, as merely being papers drawn up by their accountant and sent to them, along with other papers for signature in order to complete the records for dissolution. They testified there never was any meeting of the stockholders on that date.

Shull testified this Company had no minute book and all of the minutes of stockholders meetings introduced in evidence are typed sheets signed either by the petitioners or the secretary, and generally by all three. There is no question but that the March 31, 1952, minutes were used to permit the statute to be considered as complied with. Petitioners' argument now is that they misrepresented the facts and intentionally and affirmatively made a record showing a stockholders' meeting that adopted the liquidation plan that was false. The March 31, 1952, minutes were signed by the only two stockholders in the Company. They cannot now be permitted to deny the truth of instruments used to gain the Commissioner's ruling of compliance with the statute. We can imagine stockholders meetings might become quite informal when all of the shares of stock of a company are owned by a husband and his wife and especially when the husband owned about 99 per cent of the shares. All that we have here are a number of instruments, much alike in form, which all purport to be minutes of stockholders meetings. Petitioners state one is false and the others are genuine minutes of stockholders meetings actually held. The one they now state was false is the one they represented as genuine, under penalties of perjury, in reports to the Commissioner. Their then representation is of evidentiary value here. If the minutes of the January 1952 meetings portray true stockholders meetings, the plan then adopted could have been abandoned later. At any rate, we hold the minutes of March 31, 1952, control as the stockholders meeting at which the plan of liquidation was adopted.

Petitioners argue that the elections they filed could be withdrawn. We do not understand petitioners' argument to be that they could be withdrawn as a matter of right. Respondent's regulations (section 39.112 (b) (7)–2 of Regulations 118) provide that the written election "cannot be withdrawn or revoked." This regulation was held valid and compatible with the terms of the statute and orderly administration of the revenue laws. *Estate of Lewis B. Meyer*, 15 T. C. 850, affirmed on this specific point and reversed on another ground; *Meyer's Estate* v. *Commissioner*, 200 F. 2d 592.

It is petitioners' argument that the elections could be withdrawn in this case because no valid elections were made as they were predicated upon a mistake of fact. We do not find from this record that the elections were filed under a mistake of fact. Petitioners' accountant estimated the corporation's earned surplus at the time of the liquidation plan as between $70,000 and $90,000. His estimate did not consider the capitalized earnings of the predecessor corporation of $43,800. The actual earned surplus at the time of liquidation was $133,996.25, which included the capitalized earnings. Petitioners

testified they decided to liquidate the corporation under section 112 (b) (7), relying on their accountant's statement. But at that time the accountant was only making an estimate. Petitioners state they had no knowledge and were not advised that the capitalized earnings of the predecessor corporation had to be added. But that is not a mistake of fact. Petitioners rely heavily upon *Meyer's Estate* v. *Commissioner, supra.* There it was stipulated the taxpayers, in making their election to liquidate under section 112 (b) (7), relied upon the understated corporate earned surplus as shown by an audit of certified public accountants. The actual earned surplus, due to an earlier tax-free reorganization, was more than 10 times that figure and the Circuit Court (reversing *Estate of Lewis B. Meyer*, 15 T. C. 850), held the election could be withdrawn on the ground it was based upon a material mistake of fact. The facts here do not bring petitioners within *Meyer's Estate* v. *Commissioner, supra.* If petitioners relied upon any figure as to earned surplus given to them by the accountant it was only an approximate figure for that is all the accountant purported to give. Moreover, their withdrawal instrument does not mention reliance upon any figure of earned surplus that was given to them. It merely states they did not know that this earlier capitalized earned surplus of the predecessor had to be added to the earned surplus of the Company they were liquidating as shown on their balance sheet.

Petitioners argue the elections to liquidate under section 112 (b) (7) were made by them under a misconception of their rights under said section and since the section is for the relief of taxpayers, they should be allowed to withdraw them. Petitioners argue this misconception was prompted by the advice given to them by their accountant, who was experienced in Federal income tax matters. Part of his advice was oral and it was Shull's testimony that the accountant told him the section 112 (b) (7) liquidation would result in capital gains treatment for everything received in liquidation, including pro rata share of earned surplus and postponement of the payment of the tax until the building was sold. He asked the accountant to put his advice in a letter and in a letter to Shull, dated January 18, 1952, the accountant stated, in part:

I have previously stated that a corporation could liquidate without paying a tax upon the increased value of its real estate but upon such a liquidation a tax would be levied against the individual stockholders for such stockholders prorated portion of the accumulated surplus from operations. I do not have your balance sheets before me so that I cannot evaluate this factor. * * *

Shull interpreted the above statement in this letter as no departure from the oral advice which he said he received, in that the letter

contains no indication that the tax on individual shareholders would be other than at capital gains rates. There is not much support for Shull in the accountant's testimony. While his testimony was a little vague, it was generally to the effect that he told Shull of the possibility of liquidating so that the tax on the gain on the building transferred in liquidation could be deferred until the stockholders sold it but if this deferment plan were followed there would be another question which, as he stated, "would impinge upon them as stockholders which centered around the amount of surplus of the corporation." At no place in his testimony did he say that he told Shull a liquidation under section 112 (b) (7) meant capital gains treatment for the pro rata share of earned surplus. It is difficult to believe any accountant who was experienced in the field of Federal income tax would ever give such advice in the face of the clear statement in section 112 (b) (7) (E) (i) that the shareholder's ratable share of the earned surplus shall be "taxed as a dividend." Without in any manner indicating that reliance upon wrong tax advice would constitute grounds for withdrawal of an election, we merely say this record shows no more than a misconception of rights by failure correctly to interpret the tax advice given.

The question comes down to whether the election can be withdrawn when it is filed under a taxpayer's misconception of his rights which are quite clearly spelled out in the statutes. To hold that he could would be tantamount to holding that the withdrawal could be made as a matter of right. As earlier stated, the Commissioner's regulation and the decisions upholding it forbid this conclusion. It is true that the election to liquidate under section 112 (b) (7) is for the taxpayer's benefit but there are many such elections granted under the income tax laws and it is generally held that fact does not mean an election once made is not binding. In *Burke & Herbert Bank & Trust Co.*, 10 T. C. 1007, we said:

While enactment of a statutory choice may be prompted by a legislative intent to give relief, the burden of deciding the more advantageous course rests on the taxpayer, who must suffer the consequences of unforeseen contingencies or errors of judgment in its exercise. * * *

We hold petitioners are bound by their elections under section 112 (b) (7). Petitioners conceded at the trial that in the event of such holding they would concede the computation set forth in respondent's notice of deficiency was correct and respondent concedes on brief that the aggregate cost basis of petitioners' shares was $38,400. These concessions will be reflected in the Rule 50 computation.

*Decision will be entered under Rule 50.*